IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JESSICA L. C. T.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 19-cv-00453-DGW[2] |
| | ) |
| COMMISSIONER of SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM and ORDER

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying plaintiff Supplemental Security Income (SSI) benefits until August 13, 2015, pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for SSI in March 2014, alleging disability as of March 9, 2009. After holding an evidentiary hearing, an ALJ issued a partially favorable decision on April 23, 2018. (Tr. 14, 30-31). The Appeals Council agreed with the ALJ decision, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] In keeping with the court's practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 15.

## Issues Raised by Plaintiff

Plaintiff raises the following point:

1. The ALJ erred by cherry-picking the evidence in the course of his analysis of medical records from Banning Mental Health.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step three,

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

precludes a finding of disability. The plaintiff bears the burden of proof at steps one through four. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 2019 WL 1428885, at *3 (S. Ct. Apr. 1, 2019) (internal citations omitted).

In reviewing for "substantial evidence," this Court takes the entire administrative record into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date.

The ALJ found that plaintiff had severe impairments of obesity, hypertension, bipolar disorder not otherwise specified, generalized anxiety disorder, posttraumatic stress disorder, and borderline personality disorder.

The ALJ found that, prior to August 13, 2015, the established onset date, plaintiff had the residual functional capacity (RFC) to lift and carry fifty pounds occasionally and twenty-five pounds frequently. She could sit, stand, or walk about six hours each day in an eight-hour work day. She could push and pull as much as she could lift and carry. She could occasionally climb ramps or stairs but could never climb ladders, ropes or scaffolding. She could never work at unprotected heights or around dangerous, moving machinery. She could never operate a motor vehicle as part of her job duties. She could perform the basic mental demands of semi-skilled work where she had limited interpersonal interactions. On a sustained basis, she could understand, remember and carry out simple and semi-skilled tasks. She could occasionally interact with supervisors, coworkers, or the public.

The ALJ found that, as of August 13, 2015, plaintiff has the residual functional capacity to lift and carry fifty pounds occasionally and twenty-five pounds frequently. She can sit, stand, or walk about six hours each in an eight-hour work day. She can push and pull as much as she can lift and carry. She can occasionally

climb ramps or stairs but can never climb ladders, ropes or scaffolding. She should never work at unprotected heights or around dangerous, moving machinery. She should never operate a motor vehicle as part of her job duties. She can perform the basic mental demands of semi-skilled work. She can understand, remember and carry out simple and semi-skilled tasks. However, she cannot respond appropriately to supervisors, coworkers, or the public.

The ALJ found plaintiff could not perform any past relevant work. Based on the testimony of a vocational expert, the ALJ concluded that plaintiff was disabled, with the onset date being August 13, 2015 as opposed to March 9, 2009, because no jobs exist in significant numbers in the national economy that she can perform.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to plaintiff's arguments.

1. **Agency Forms**

Plaintiff was born in 1980 and was 37 years old on the date of the ALJ's decision. (Tr. 196). Between 2006 and 2012, she worked as a retail stocker, and was self-employed as a child care worker and home aide[4]. (Tr. 201).

In a Function Report submitted in July 2015, plaintiff said she could not work because her conditions caused her to not leave her house and not want to be around people. She said she took care of her husband, niece, nephew, and animals.

---

[4] Plaintiff clarified at the evidentiary hearing that she never worked as a home aide but as a child care worker/babysitter. The ALJ decided to not consider this as past work. (Tr. 67-68).

Plaintiff said she went back and forth between cleaning and sleeping in a very compulsive manner. She said she needed reminders to take medicine, she never prepared meals because it caused her stress, and, if she went anywhere, she either went to the store, church or visited her family. She said she did not follow written or spoken instructions, she did not get along with authority figures, and she lost a job because she does not like people and being told what to do. (Tr. 226-232).

2. **Evidentiary Hearing**

An attorney represented plaintiff at the evidentiary hearing in December 2017. Counsel was concerned about certain medical records submitted to the court the day prior, including an MRI report conducted at St. Anthony Hospital, and the totality of the mental health records from Banning Medical. (Tr. 38, 40). The ALJ agreed to admit these records. (Tr. 43).

Plaintiff said she was employed at Kmart as a stocker and was self-employed through the county as a babysitter. Plaintiff often deferred certain questions to her sister and said, "My sister takes care of everything." Plaintiff said she lives with her husband, sister, niece, nephew, and stepson. (Tr. 46-51). At one point, plaintiff asked for a break as she felt overwhelmed, and her sister, Nelle Steele, testified on plaintiff's behalf. (Tr. 54).

Ms. Steele said plaintiff is always in her room. On bad days, she is lucky if plaintiff will eat or even get up to go to the bathroom. She said plaintiff does not shop by herself because she gets irritated at people and will want to fight them, and things worsened in 2009 after plaintiff was hospitalized. Ms. Steele said plaintiff

lost her job at Kmart over a miscommunication that almost turned into a physical altercation. (Tr. 56-58). Ms. Steele also said plaintiff is nice to the elderly but will negatively react to everyone else, so she stays to herself. She said plaintiff very frequently thinks people are looking at her in public, it will strongly irritate her, and she will confront them about it. (Tr. 61-62).

A vocational expert (VE) said a person who cannot respond appropriately to coworkers, supervisors, or the public cannot perform any jobs within the national economy. (Tr. 74).

### 3. Relevant Medical Records

Since plaintiff raises concerns limited to Banning Mental Health medical records prior to August 2015, only those will be addressed here.

Between September 2012 and August 2015, plaintiff was on multiple mental health medications such as Lexapro, Lamictal, Paxil, Depakote, Vistaril, Trazodone, Quetiapine, Paroxetine and Guanfacine, among others. Plaintiff underwent multiple medication modifications within that time frame. Depakote was increased from 1000 mg per day to 1500 mg per day between September 2012 and June 2013. Paxil was both increased and decreased between October 2012 and April 2013. Quetiapine was both increased and decreased between July and December 2013. Paroxetine was increased from 60 mg per day to 80 mg per day between December 2013 to January 2014. Guanfacine was increased from 1 mg per day to 2 mg per day between December 2013 and January 2014. Lamictal was increased from 100 mg to 200 mg between August and October 2014. Lexapro was

increased from 10 mg to 20 mg between August and December 2014. (Tr. 1214-1224).

Dr. Robert Allen, a psychiatrist, saw plaintiff on September 24, 2012. Plaintiff said she experienced daily mood lability, would act out anger with family and friends, had reactive irritability, was depressed, and had manic or hypomanic episodes. She reported excessive anxiety, said she is always worried about something, said she does not like being around people, and had nightmares about her mother abusing her in the past. Plaintiff reported using medical marijuana daily for sleep. (Tr. 1209-1210). Plaintiff reported in the past she would burn herself with rubber erasers until she finished high school. She also tried overdosing on pills, but her husband took them from her. The doctor noted plaintiff's present mood was depressed, her affect was labile, her judgment was impaired, and he increased Depakote. (Tr. 1212-1213).

Plaintiff presented to Banning in October 2012. Dr. Andrew Elliott, a psychiatrist, diagnosed plaintiff with Schizophrenic Disorder, Borderline Personality Disorder, Panic Disorder, Posttraumatic Stress Disorder, and Amphetamine and Other Psychostimulant Dependence in remission. (Tr. 1207). Plaintiff reported she was doing a lot better, said her moods were different, and said she was slower to react with anger. She said she felt a bit more depressed, however, and isolated herself a lot. That same month, Dr. Allen suggested plaintiff attend groups and recovery sessions to which plaintiff expressed both excitement and anxiety about. Plaintiff had issues receiving her medications on October 12,

2012, as there was a pharmacy mix up. (Tr. 1225-1226).

In November 2012, a Banning progress note stated plaintiff felt edgy and depressed due to losing two children she took care of. (Tr. 1227).

Plaintiff had an appointment at Banning scheduled for December 17, 2012, but she cancelled a few minutes before her appointment. She later requested a medication refill and stated she felt stable on her current medication. (Tr. 1228).

In January 2013, plaintiff reported having some suicidal ideations as of recent but with no plan or intent, saying, "I won't do that to my grandmother." She said she was more depressed over the holidays, had a fight with her sister, her sister attempted suicide, her mother caused issues, and her grandmother had been sick. She said "I sleep too much. If I sleep, I don't have to deal with it." Plaintiff again expressed a desire to go to group sessions but expressed concern about continuing to attend. She reported acting out certain behaviors daily, including hitting, pinching, screaming, burning, and biting other family members. Plaintiff applied for medical benefits that would help reduce her mental health symptoms, and her anxiety decreased when Banning helped her with the application as it would reduce the time she would need to wait in line around other people to renew her insurance. (Tr. 1228-1230).

Plaintiff presented to Banning again in April 2013 and reported burning her roommate and hitting her husband. She ran out of medication, but her response to the medication was good when she was compliant. Plaintiff moved to Reno since her last visit and was unable to get treatment there, which resulted in plaintiff being

off her medications for a few months. She was then charged with carjacking, ended up in jail, was put in the suicide tank for twenty-four hours, and was released the next day. She was irritable, losing her temper, and impulsive while off her medications. (Tr. 1231-1232).

In May 2013, plaintiff called Banning to get a refill on her medications. She expressed concerns about worsening anger, recognized deep breathing as a coping skill, and learned relaxation exercises for coping with her symptoms. (Tr. 1232).

Plaintiff reported burning herself and others with cigarettes in June 2013. She said she preferred to stay in her house and felt anxious and panicky when she went outside. She reported feeling stressed by many things and would burn her legs with cigarettes to make herself feel better. She continued to sleep a lot. (Tr. 1233).

In July 2013, plaintiff reported worsening depressed feelings and irritability since moving back in with her mother, said her mother constantly harassed her, and said she hoped to only be there for three weeks. She said she slept five to six hours a night and reported feeling depressed and angry a lot. Later that month, plaintiff reported her mood was better, she had not been cutting or burning herself, but she was still not sleeping well at night. She took 100 mg of Seroquel one night to help her sleep. (Tr. 1233-1234).

In September 2013, plaintiff had issues with her insurance regarding medication refills. Plaintiff reported having around three behavioral outbursts per week and reported feeling depressed three to four days per week. After missing an

appointment at Banning, plaintiff became angry while speaking to a writer from Banning about not receiving her medications but was told she could go to the emergency room in the meantime for an emergency supply of medications until her next appointment on September 30, 2013. The doctor later authorized two weeks of Seroquel with the understanding plaintiff would return for her appointment on September 30. Plaintiff reported increased anxiety as her father-in-law had been very ill and could potentially die. A licensed clinical social worker (LCSW) suggested plaintiff use her deep breathing skills and tools such as snapping her wrist for different ways to distract her from feeling anxious. (Tr. 1235-1237).

Plaintiff cancelled her psychiatrist appointment on October 28, 2013, stating she missed the bus. (Tr. 1237).

Plaintiff presented to Banning on December 4, 2013, to address her physical aggression towards others. (Tr. 1239).

In January 2014, plaintiff presented to Banning reporting impulsivity, reactive irritability, and aggression. Plaintiff reported increased anger when around her mother, and she wanted to get out of the car and assault the driver behind her the day prior. She had less nightmares after starting Tenex, experienced nocturnal enuresis[5], and would continue to sleep excessively to avoid life. (Tr. 1238-1239).

In February 2014, plaintiff did not show for two appointments. (Tr. 1240).

Plaintiff missed her appointment on March 5, 2014, and called in to say she was ill. Plaintiff missed two other appointments, one scheduled for March 19, 2014

---

[5] Nocturnal enuresis refers to "nighttime bedwetting."
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3348193/, visited on January 3, 2020.

and the other for March 31, 2014. (Tr. 1240-1241).

Plaintiff did not return to Banning until August 7, 2014. She said she had been off Depakote, Paxil, and Seroquel for two months. Plaintiff said she was feeling overwhelmed and said, "I'm a cutter." Plaintiff reported having one panic attack daily, recurrent depression, and the use of methamphetamine a month prior. Plaintiff reported a history of sexual abuse up to twelve years old, nightmares that wake her up, and continued difficulties with sleep. She reported intrusive racing thoughts, thought insertion by her mother, and thoughts of hurting people. She reported feeling shaky with Seroquel, and Paxil did not help her depression. Plaintiff said she felt hateful at everyone, her concentration was up and down, and she slept twenty hours a day to avoid feeling. She denied both suicidal and homicidal ideation. Dr. Elliott referred plaintiff to dialectical behavior therapy groups, informed plaintiff of the need for sobriety, and prescribed Lexapro and Lamictal to treat plaintiff's mood reactivity. (Tr. 1241-1242).

Dr. Elliott saw plaintiff on October 2, 2014. (Tr. 1207-1208). Plaintiff reported feeling like a new person, saying the medications really work. Dr. Elliott increased plaintiff's Lexapro and Lamictal and referred plaintiff to therapy groups. Plaintiff reported having less nightmares, slightly reduced mood reactivity, mild anxiety, and reported sleeping only three to five hours per day with no napping. (Tr. 1242).

On December 5, 2014, plaintiff and her sister called Banning saying plaintiff had an appointment that day with Dr. Griffith, a psychiatrist. The LCSW said

plaintiff's appointment was actually on January 5, 2015 instead of December 5, 2014. Plaintiff and her sister proceeded to become aggressive and hostile over the phone. They inquired about a letter Dr. Griffith agreed to write stating plaintiff should not work, but the LCSW found no documentation of this which resulted in plaintiff again becoming aggressive. The LCSW told plaintiff to discuss the issue with Dr. Griffith. (Tr. 1243).

Plaintiff presented to Banning on December 8, 2014, expressing increased anxiety due to the return of her roommate's son and saying the child antagonizes her, touches her, and causes extreme distress and anxiety. She reported increased depression and an episode of self-harm but denied any suicidal or homicidal ideation. She reported only sleeping about three to five hours per day with some napping. Plaintiff's Lexapro was increased and Vistaril was added. Skills were discussed for plaintiff to use when she becomes anxious or emotionally dysregulated. Plaintiff was to reach out to family for support and to set boundaries with her roommate and roommate's son. Plaintiff stated she could not go to groups due to her anxiety but would call her family, go to her father's home, or spend time with her dog when she wanted to hurt herself. (Tr. 1243-1244).

Plaintiff called Banning on December 23, 2014, stating she lost her welfare due to Banning not sending her letter from Dr. Griffith in time. After discussing this with Dr. Griffith, the LCSW apologized and informed plaintiff of different errors made in the process on both sides. Dates were missing on the form, and Dr. Griffith stated plaintiff could work part-time at a low-stress job. Plaintiff expressly

disagreed with this and said her previous psychiatrist wrote letters saying she could not work at all. Plaintiff became verbally aggressive at the LCSW and demanded she be given the form from Dr. Griffith after signing it. However, the LCSW said Dr. Griffith preferred to fax the form from the clinic, and plaintiff again became verbally aggressive suggesting she would come to the clinic and talk to the supervisor. Plaintiff returned to Banning the next day to get the paperwork issues figured out. (Tr. 1244-1245).

Plaintiff presented to Banning in January 2015. Plaintiff was given Trazodone. She said she had a confrontation with someone in the waiting room. She reported doing better as the child who antagonizes her left after threatening to kill the dogs and multiple people. Plaintiff reported still having mild depressive symptoms and irritability. She said she was up every four hours ever day with some napping. Although her appetite was reportedly low, she had normal energy and concentration and denied both suicidal and homicidal ideation. (Tr. 1245).

Plaintiff did not show for her scheduled appointment on February 17, 2015. (Tr. 1246).

Plaintiff called Banning in June 2015 requesting medication refills. She said she lived in Illinois but could not see a doctor there until August 2015 and was told to request refills from Banning until that time. Plaintiff last presented to Banning in January 2015. No refills were available due to this absence and due to living out of state. Plaintiff yelled obscenities and prematurely hung up. (Tr. 1246).

## Analysis

The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). The ALJ must consider all relevant evidence. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); 20 C.F.R. § 404.1545 (a)(1) and (3). Moreover, the ALJ must "engage sufficiently" with the medical evidence. *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). The ALJ "need not provide a complete written evaluation of every piece of testimony and evidence." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (citation and internal quotations omitted). However, the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted.

Plaintiff argues the ALJ engaged in cherry-picking the evidence in the course of his analysis of the Banning Mental Health evidence predating August 13, 2015. More specifically, plaintiff claims the ALJ completely failed to mention the targeted symptoms for the first nineteen months of treatment, failed to mention medication changes and the upward titration of her medications, and omitted certain aspects of Dr. Griffith's opinion regarding plaintiff's ability or inability to work. Plaintiff's argument is well-founded in that the ALJ cherry-picked the Banning evidence within the disability analysis.

In Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment, plaintiff claims the ALJ completely failed to mention the targeted behaviors within the first nineteen months of her psychiatric treatment. Said targeted behaviors include severe mood lability, mood reactivity, violence towards others, depressed mood, and self-mutilation. (Tr. 1236). Contrary to plaintiff's argument, the ALJ mentioned the targeted behaviors multiple times within his discussion of the Banning medical records dating from September 2012 to June 2015. (Tr. 20-23). Therefore, plaintiff is incorrect in saying the ALJ completely failed to mention the aforementioned mental health symptoms.

Plaintiff argues the ALJ omitted that Dr. Griffith was considering part-time work when Dr. Griffith said plaintiff was capable of performing low stress work. However, contrary to plaintiff's argument, there was no omission as the ALJ did in fact mention this. (Tr. 22). The ALJ noted Dr. Griffith's opinion, while also discussing the new form completed at plaintiff's request stating plaintiff was unable to work regardless if it was part time or full time. (Tr. 22-23). Therefore, plaintiff's argument is incorrect.

Plaintiff is on point with her argument that the ALJ failed to mention or discuss plaintiff's medication changes throughout her treatment at Banning, including any upward titration of her medications. The ALJ mentioned only when plaintiff ran out of medication, when she was off medication for a few months, when she had to request refills, or when she was allegedly noncompliant with her medications. (Tr. 21-24). The only reference by the ALJ to specific medications

regarded a mere mention of Depakote and Seroquel. (Tr. 20-21). In contrast, the medical records reflect multiple medication changes, with nine of those medications used for mental health purposes. As mentioned above, plaintiff took nine different mental health medications between the years 2012 and 2014, and the Banning medical records reflect both increases and decreases of at least seven of these mental health medications between 2012 and 2014. (Tr. 1214-1224).

Additionally, the ALJ failed to mention the multiple medication modifications while only focusing on plaintiff's noncompliance with her medications and how much the medications helped when plaintiff complied. (Tr. 20-22, 24). The ALJ failed to mention how, "[M]ental illness in general . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 629–30 (7th Cir. 2006). Also, individuals who suffer from mental illnesses, such as bipolar disorder, often have issues with medication compliance due to the very nature of their mental illness. *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011). The ALJ made no express or implied effort to consider this when discussing plaintiff's noncompliance, and therefore left a gap in his decision.

Defendant is correct that the ALJ mentioned the targeted behaviors within his discussion and analysis of the medical records. However, defendant argues that the ALJ considered all the medical records that plaintiff alleges he ignored. This blanket statement is not true because the ALJ neither discussed nor mentioned any of the multiple medication changes. Any discussion of medications by the ALJ

simply regarded plaintiff's compliance and noncompliance with said medications. Defendant furthers their argument suggesting illnesses that are controlled by treatment are not considered disabling. However, defendant fails to account for individuals who suffer from mental illnesses who, due to the very nature of their diseases, often find it difficult to stay on track with their treatment. Additionally, there was no discussion as to how many times the doctors modified plaintiff's medications, increased or decreased dosages, and the effect that might have on a person with mental illnesses, like plaintiff. Therefore, defendant's arguments are not substantiated.

Medications and medication modifications played a substantial role within plaintiff's mental health treatment at Banning. Plaintiff showed improvements when in compliance with her medications and showed massive regression when noncompliant with medications. Additionally, it stands to reason plaintiff's psychiatrists thought the medications were not helpful enough, so they continued to modify them. With that said, it is not implausible that plaintiff's mental state would be severely affected by multiple medication modifications when those medications are brain-altering. It is clear the ALJ neither discussed nor mentioned this effect.

As mentioned above, an ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted. Here, the ALJ's failure

to discuss or even mention the multiple medication modifications plaintiff went through leaves a gap in the ALJ's decision as these medication changes were several in number and were taken over two years' time or more. These modifications constituted a significant part of plaintiff's treatment and consequently should have been considered. Therefore, the Court must conclude that the ALJ failed to build the requisite logical bridge here.

This Memorandum and Order should not be construed as an indication that the Court believes plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision finding plaintiff not disabled until August 13, 2015, is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE: January 8, 2020.**

**DONALD G. WILKERSON**
**UNITED STATES MAGISTRATE JUDGE**